UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Victor R. Thibodeau


        v.                          Civil No. 08-cv-308-JD
                                    Opinion No. 2009 DNH 041

Michael J. Astrue, Commissioner,
Social Security Administration


                    O R D E R

     Victor R. Thibodeau seeks review, pursuant to 42 U.S.C. §
405(g), of the Commissioner's decision denying his application
for Social Security Disability Benefits.  Thibodeau seeks
reversal of the Commissioner's decision, contending that the
Appeals Council erred in denying his request for review and that
the Administrative Law Judge ("ALJ") erred in his assessment of
Thibodeau's limitations and his ability to work.  The
Commissioner moves for an order affirming the decision.


                    Background

     Victor Thibodeau was working at a construction site on
November 16, 2004, when he fell through a hole on the second
floor of the commercial building where he was working.  He was
admitted to Elliot Hospital for treatment of a compression
fracture of the spine and fractures on his right pelvis, hip, and

leg.  He also injured his right thumb.  Three days later, he was discharged from the hospital to a nursing facility to receive physical therapy.

On December 7, 2004, Thibodeau was discharged from the nursing facility and began physical therapy at home.  Thibodeau began to walk with assistance and could walk short distances without assistance.  X-rays in January of 2005 showed that the fractures were healing but that the spinal compression had increased.  Thibodeau reported that he was still experiencing significant discomfort.  Thibodeau continued to report constant back pain after eight physical therapy sessions.

Thibodeau obtained a second opinion on March 1, 2005, from Dr. Uri M. Ahn.  On examination, Dr. Ahn found full motor strength in Thibodeau's legs with symmetric reflexes.  Because of the constant back pain, however, Dr. Ahn noted that conservative treatment had failed and recommended kyphoplasty.[1]  Thibodeau underwent the kyphoplasty procedure on March 30, 2005.  In subsequent appointments, Thibodeau reported continuing improvement.

---

[1]Thibodeau failed to provide a definition of kyphoplasty. LR 9.1(b)(2).  Kyphoplasty appears to be a surgical procedure to address pain and instability caused by a spinal fracture.

On May 18, 2005, Thibodeau began physical therapy with Michael Michaud.  During his initial evaluation, Thibodeau complained of constant lower back pain that increased during the day and if he did any lifting.  The pain also disturbed his sleep.  Despite the back pain, Thibodeau said that overall he felt better since the kyphoplasty procedure.  Michaud found Thibodeau's range of motion in the lumbar spine to be at 75%.[2] Michaud concluded that Thibodeau's back pain was consistent with his diagnosis and was due to muscle weakness that could be improved with exercises.  Michaud discharged Thibodeau from physical therapy in December of 2005, with a home exercise program and modified daily activities.

Dr. Ahn cleared Thibodeau for light-duty work on June 23, 2005.  A functional capacity evaluation on September 13, 2005, found that Thibodeau could do full-time light-duty work with restrictions on standing, walking, bending, reaching, squatting, kneeling, climbing, and crawling.  The evaluation found that Thibodeau could sit for up to sixty minutes, stand or walk for up to thirty minutes, and drive for thirty to sixty minutes.

On July 24, 2006, a state agency medical consultant, Dr. Jonathan Jaffe, assessed Thibodeau's residual functional capacity

---

[2]The factual statement includes other findings expressed in medical terminology, which is not explained.  See LR 9.1(b)(2).

based on his medical records.  Dr. Jaffe concluded that Thibodeau could lift and carry twenty pounds occasionally and ten pounds frequently.  He could stand, walk, and sit for six hours in an eight-hour day.  He could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Dr. Jaffe found no manipulative, communicative, visual, or environmental restrictions.  He also stated that in his opinion the objective medical evidence did not support the limitations Thibodeau claimed.

For purposes of workers' compensation, Dr. Isadore G. Yablon examined Thibodeau on October 19, 2006, for an independent medical evaluation.  Dr. Yablon noted that Thibodeau complained of back pain and pain in his right hip and pelvis.  He concluded that Thibodeau could not return to his prior work as an iron worker but that he could do sedentary work or moderate work that did not require lifting more than twenty-five pounds or repeated bending, lifting, stooping, or climbing.  In an addendum to his report to the workers' compensation insurance carrier dated December 12, 2006, Dr. Yablon also stated that Thibodeau could stand, walk, and sit for eight hours per day but that he should not drive because of the danger of further injury to his spine from road bumps.

Dr. Barbara O'Dea examined Thibodeau on January 22, 2007. She found that Thibodeau should avoid lifting more than twenty

4

pounds and no more than ten pounds frequently.  She also found that Thibodeau should avoid staying in one position for more than an hour.  She believed, contrary to Dr. Yablon's opinion, that the spinal compression fracture was the reason that Thibodeau continued to experience significant back pain that would limit his functional capacities.  Dr. O'Dea concluded that Thibodeau needed a job that would let him change positions as needed, that would avoid repetitive bending, twisting, and climbing.

On January 12, 2007, Thibodeau began treating with Dr. Robert F. Spencer for pain management.  Thibodeau described pain at a level of 7 on a 0 to 10 scale and drowsiness, fatigue, sleep disturbance, poor concentration, and depression due to pain.  Dr. Spencer diagnosed pain in the thoracic spine and low back, and lumbar disc displacement.  He also noted possible myofascial pain and facet joint pain.[3]  Dr. Spencer prescribed a Transcutaneous Electrical Nerve Stimulation ("TENS") unit to address the pain issues.[4]

On a return visit to Dr. Spencer two weeks later, Thibodeau rated his pain at two out of ten, with a range of high intensity

_____

[3]Again, Thibodeau failed to provide definitions for these medical terms.

[4]A TENS unit appears to address pain by sending electrical impulses to certain areas of the body where pain originates.

at eight and low pain at one.  Thibodeau reported 40% relief from
pain while using the TENS unit and a four-hour residual effect.
Dr. Spencer recommended continued use of the TENS unit and an
epidural steroid injection.

Thibodeau received a steroid injection on February 1, 2007.
At his follow-up visit with Dr. Spencer, Thibodeau rated his pain
at 5.  Dr. Spencer recommended another injection, which was done
on March 8, and additional injections, which were done on March
29.  Thibodeau had a follow-up appointment on April 11 but no
records from that visit were provided.

The administrative medical record concludes with the
injection treatment in March of 2007.  On August 16, 2007, after
the administrative hearing, Dr. Spencer performed a radio
frequency heat lesioning procedure on six nerves in Thibodeau's
back.  The parties provide no explanation of the procedure other
than an excerpt from Dr. Spencer's medical report.[5]  Dr. Spencer
reported that Thibodeau tolerated the procedure well and that a
follow-up was scheduled for September 5, 2007.

---

[5]Thibodeau describes the procedure as a "drastic attempt to
destroy six nerves" in his spine and refers the court to
webmd.com for more information.  The plaintiff, however, bears
the burden of researching  medical terminology and providing
definitions.  LR 9.1(b)(2).  The court does not do internet
research to glean information about undefined medical
terminology.

Thibodeau applied for disability insurance benefits on March 21, 2006, alleging disability beginning on the day of his fall, November 16, 2004.  After his application was denied initially, Thibodeau sought a hearing before an ALJ, which was held on August 10, 2007.  Thibodeau, who was represented by a paralegal from his attorney's office, and a vocational expert testified at the hearing.

Thibodeau explained his accident, his injury, and the treatment that followed.  He testified that he continued to experience pain that ranged from two to eight on a zero to ten scale and that most of his days were at the higher range.  On bad days, Thibodeau said, he needed to constantly change position from sitting, to walking, to lying down.  He said that he could walk on a level surface for fifteen to twenty minutes before his hip and back would begin to hurt.  He also testified that he spent more than half of every day lying in bed.  He answered that he could not work a full forty-hour week because his lack of sleep and back pain made it impossible for him to get out of bed. He testified that the activity of the residual functional capacity evaluation caused him excruciating pain the next day.

Despite his pain, Thibodeau testified that he did not take medication.  He explained that medication had not helped the pain.  While some medications worked for a while, they would lose

7

effectiveness and other medication upset his stomach.  When his doctor told him he was taking too much Ibuprofen, Thibodeau stopped taking it altogether.

The ALJ posed a hypothetical question to the vocational expert of a person who was limited to work between sedentary and light levels, who could sit or stand for four hours but needed to change positions every fifteen minutes, who could only occasionally do things such as stooping or balancing, and who needed indoor work.  The vocational expert answered that those criteria would allow work as an order clerk and a credit analyzer at the sedentary and unskilled level.  When the ALJ added a limitation that the person would need to lie down frequently while working, the vocational expert said that limitation would eliminate the job base.

The ALJ issued his decision on August 21, 2007.  He found that despite his limitations, Thibodeau retained the capacity to do light work with restrictions on weight, movement, and other activities.  Based on the vocational expert's testimony, the ALJ found that there were jobs in the national economy that Thibodeau could do and concluded that he was not disabled.

Thibodeau sought review by the Appeals Council.  With the request for review, Thibodeau submitted new evidence consisting of a letter dated February 6, 2008, from his physical therapist

to his physician, a report dated September 24, 2007, of extended disability from the New Hampshire Department of Labor, and Dr. Spencer's report of the radio frequency heat lesioning procedure performed on August 16, 2007.  The Appeals Council considered the evidence of Thibodeau's treatment in August of 2007 but found the additional evidence did not provide a basis for changing the ALJ's decision and denied review.

Discussion

In support of his motion to reverse the Commissioner's decision, Thibodeau contends that the Appeals Council erred in denying review, in light of the new evidence presented. Thibodeau also contends that the ALJ erred in his residual functional capacity assessment, in failing to consider the vocational expert's opinion about elimination of the job base if frequent periods of lying down were needed, and in failing to ask the vocation expert about conflicts between his testimony and the Dictionary of Occupational Titles.  The Commissioner supports the decision.

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a).  The applicant bears the burden through the first four steps to show

that he is disabled.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st
Cir. 2001).  At the fifth step, the Commissioner bears the burden
of showing that jobs exist in the national economy that the
applicant can perform.  Id.

The court's review under § 405(g) is "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence." Nguyen v.
Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the ALJ's factual
findings are supported by substantial evidence in the record,
they are conclusive, even if other evidence would support a
contrary conclusion.  Id.; Tsarelka v. Sec'y of Health & Human
Servs., 842 F.2d 529, 535 (1st Cir. 1988).  Substantial evidence
is "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." Richardson v. Perales, 402
U.S. 389, 401 (1971).

A.  Appeal Council's Denial of Review

Thibodeau contends that the Appeals Council erred by denying
his request for review, which was supported by new medical
evidence, including Dr. Spencer's report of the radio frequency
heat lesioning procedure performed on August 16, 2007.  In its
decision the Appeals Council stated:  "In looking at your case,
we considered the additional evidence listed on the enclosed

Order of Appeals Council."  The Appeals Council concluded, however:  "We found that this information does not provide a basis for changing the Administrative Law Judge's decision."

For purposes of judicial review, decisions of the Appeals Council are entitled to great deference.  <u>Mills v. Apfel</u>, 244 F.3d 1, 6 (1st Cir. 2001).  Therefore, a challenged decision is reviewable only if the decision "rests on an explicit mistake of law or other egregious error."  <u>Id.</u> at 5.

In support of his motion, Thibodeau contends the Appeals Council erred because the social security regulations require it to review a case when new evidence is submitted.  The cited regulation, however, states that the Appeals Council will review a decision if there appears to be an abuse of discretion by the ALJ, if there is an error of law, if the decision is not supported by substantial evidence, or if the decision implicates a broad policy or procedural issue.  20 C.F.R. § 404.970(a).  With respect to new evidence, the regulation states:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record.

11

§ 404.970(b).  In this case, the Appeals Council found that the new evidence Thibodeau submitted "does not provide a basis for changing the [ALJ's] decision."  Therefore, the Appeals Council complied with the requirements of § 404.970.[6]

Thibodeau also contends that the ALJ had a mistaken impression that he had not received treatment for back pain since April of 2007, which contributed to his finding that Thibodeau's description of the intensity, frequency, and limiting effects of his pain was not entirely credible.  He argues that Dr. Spencer's record of the radio frequency heat lesioning procedure supports his testimony about the degree of his continuing back pain both by showing that he continued to be treated for pain and because the procedure was "a drastic attempt" to find relief.

Although the new evidence provides evidence of ongoing pain and possibly of the degree of pain, which contradicts the ALJ's conclusion that Thibodeau did not require treatment for pain after April of 2007, that was not the sole reason for discounting the degree of pain Thibodeau claimed.  The ALJ also considered that Thibodeau did not take medication for pain, that he had not reported that he needed to spend half of each day in bed to his

_____

[6]Although the Appeals Council used boilerplate language in denying review, its reasoning is sufficiently articulated to apply the Mills standard.  Cf. Rosado v. Barnhart, 340 F. Supp. 2d 63, 68 (D. Mass. 2004) (remanding boilerplate decision).

treating or examining physicians, and that his treating and examining physicians all found that he was able to work.  In the context of the record as a whole, the Appeals Council's reason for not reviewing the ALJ's decision was not an egregious error.[7]

B.  Residual Functional Capacity

The ALJ found that Thibodeau retained the ability to do work that did not require lifting more than twenty pounds occasionally and ten pounds frequently.  He also found that Thibodeau would need to be able to change positions from sitting to standing or walking every fifteen minutes, that he could not kneel, crouch, crawl, bend, or stoop more than occasionally, and that he would need to work indoors and avoid temperature extremes.  Thibodeau faults the ALJ's residual functional capacity finding, arguing that the ALJ erred in failing to include limitations that Thibodeau would need to lie down to relieve back pain on an as needed basis and would have to avoid driving.

If the residual functional capacity finding is supported by substantial evidence in the record, it is conclusive.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  Findings are not

---

[7]Thibodeau does not seek a remand under sentence six of § 405(g).  See Seavey v. Barnhart, 276 F.3d 1, 12-13 (1st Cir. 2001)

conclusive "when derived by ignoring evidence, misapplying the
law, or judging matters entrusted to experts."  Id.  In general,
an ALJ, as a lay person, cannot interpret a claimant's medical
records to determine his residual functional capacity.  Manso-
Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st
Cir. 1996).  Instead, an ALJ must rely on residual functional
capacity evaluations done by a physician or another expert.  Id.
at 17-18.

     The ALJ's residual functional capacity finding is based on
record evidence, which Thibodeau concedes.  Thibodeau argues,
however, that the ALJ ignored his own findings and other record
evidence that supported limitations for lying down and driving.


     1.  Lying down.

     Thibodeau states that the ALJ found that his reported
symptoms, including unrelenting pain which required him to lie
down, could be expected to result from his medically determinable
impairments.  He contends that based on that finding, the ALJ
erred by failing to include the lying down limitation in his
hypothetical to the vocational expert and in his residual
functional capacity finding.  Thibodeau misunderstands the ALJ's
analysis.

While the ALJ found that Thibodeau's impairments generally could be expected to cause his symptoms, meaning pain, the ALJ then explained that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  The ALJ then discussed the evidence that undermined the credibility of Thibodeau's description of the limitations caused by his pain.  Therefore, the ALJ did not find that Thibodeau's impairments required him to be able to lie down as needed to relieve his back pain.

Thibodeau also asserts that medical evidence supports his testimony that he needed to lie down more than half of each day to relieve his back pain.  He points to a printed form titled "Activities of Daily Living with Osteoporosis," that apparently was provided to him by his physical therapist.  The form gives advice for avoiding discomfort and further injury due to osteoporosis and also provides strengthening exercises.  The form states that lying on the back is the best position for sleeping and advises patients to lie in that position several times a day especially for back ache.

The form does not have a date or indicate under what circumstances it was provided to Thibodeau.  The last physical therapy record, however, is a letter, dated December 30, 2005, from Thibodeau's physical therapist to his treating physician

15

that says Thibodeau's last physical therapy appointment was in
August of 2005 and recommending that Thibodeau be discharged from
physical therapy.  Therefore, to the extent the form indicates
that lying down was a recommended therapy for back pain, it
appears to relate to Thibodeau's condition and treatment at least
two years before the social security hearing.  Therefore, the
form does not show that a treating source advised Thibodeau to
lie down on a daily basis any time after August of 2005 at the
latest.  None of doctors who treated or examined Thibodeau
suggested that he would need to be able to lie down during the
day on an as needed basis.  Therefore, the ALJ did not err in
omitting the lying down limitation.

    2.  <u>Driving.</u>

Thibodeau relies on Dr. Yablon's report to his workers'
compensation carrier to support his theory that the ALJ should
have included a driving limitation in his residual functional
capacity assessment.  Dr. Yablon wrote on December 12, 2006, that
Thibodeau should avoid driving because going over bumps could
cause compression of the spinal cord resulting in a neurological
deficit.  As the Commissioner points out, however, Thibodeau does
not contend that Dr. Yablon advised him not to drive or included
driving as a limitation as part of his functional capacity

assessment.  Indeed, Thibodeau stated in his undated function report that he did drive and has not indicated that he stopped driving at any time before the hearing.  Therefore, the ALJ did not ignore record evidence by omitting a driving restriction.

C.  Effect of Lying Down Limitation

Thibodeau contends that the ALJ improperly ignored the vocational expert's opinion that if he needed frequent periods of lying down to relieve pain the job base would be eliminated.  As is discussed above, the record does not support a limitation for frequent periods of lying down.  Therefore, the ALJ properly did not consider that part of the vocational expert's opinion.

D.  Failure to Inquire About Possible Conflicts Between the Vocational Expert's Testimony and the Dictionary of Occupational Titles ("DOT")

The vocational expert testified that the two jobs he recommended, order clerk and credit authorizer, were both unskilled.  Thibodeau represents that the DOT lists both jobs as semi-skilled.[8]  Relying on Social Security Ruling 00-4p,

_____

[8]The DOT assigns skill levels to particular jobs.  Skill levels 1 and 2 are unskilled; skill levels 3 -4 are semi-skilled, and skill levels 5 -9 are skilled work.  See Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704, at *3.

Thibodeau contends that the ALJ erred by not inquiring into the conflict between the vocational expert's testimony and the DOT.

"Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" Sullivan v. Zebley, 493 U.S. 521, 531 n.9 (1990) (quoting 20 C.F.R. § 422.408). In general, a vocational expert's occupational evidence should be consistent with the DOT. SSR 00-4p at *2. "At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." Id. "When there is an apparent unresolved conflict between VE or VS [vocational expert or vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." Id.

In this case, the vocational expert did not mention the DOT, and the ALJ failed to inquire as to whether his opinions were consistent with the DOT. Thibodeau contends that an inconsistency existed, because the order clerk and credit authorizer positions, identified by the vocational expert, are both semi-skilled in the DOT not unskilled as the vocational

18

expert reported.  The Commissioner argues that the inconsistency exists only as to one of the positions and that, in any case, the inconsistency is immaterial.

The Commissioner represents that an order clerk is an unskilled position, as the vocational expert testified.[9]  Because the vocational expert properly identified that job category, the Commissioner contends, that evidence satisfies the burden at step five to show that jobs exist that Thibodeau could do.  See Seavey, 276 F.3d at 5; Johnson v. Barnhart, 2004 WL 1529296, at *5 n.7 (D. Me. June 24, 2004).  It appears, however, that only one of the several "order clerk" positions in the DOT is unskilled.  The vocational expert did not identify which of the DOT positions he was relying on to support the number of jobs identified in the national and local economies.  Therefore, the vocational expert's opinion as to how many such jobs existed in the national and local economies is unsupported.

The Commissioner also contends that whether the jobs are semiskilled or unskilled is irrelevant because Thibodeau has a high school education and no limitations on his mental faculties, which qualifies him for semiskilled work.  Claimants with a high

---

[9]The vocational expert did not provide the DOT listing for the jobs he recommended.  Thibodeau and the Commissioner rely on different listings for order clerk, which explains the different skill level requirements.

school education are presumed to be capable of semi-skilled through skilled work.  See 20 C.F.R. § 404.1564(b)(4).  Thibodeau provides no evidence to rebut the presumption that he is capable of doing semi-skilled work.

Therefore, in this case, the ALJ's error is harmless.[10]  The vocational expert's testimony about jobs provides substantial evidence to support the ALJ's decision.

<u>Conclusion</u>

For the foregoing reasons, the claimant's motion to reverse the Commissioner's decision (document no. 8) is denied.  The Commissioner's motion to affirm (document no. 9) is granted.

---

[10]Because not all such errors will be harmless, it would be advisable for ALJs to routinely ask each vocational expert whether his or her opinion is consistent with the DOT, as SSR 00-4p requires, and to resolve any conflicts that are identified. See <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1233 (9th Cir. 2009); <u>Overman v. Astrue</u>, 546 F.3d 456, 463 (7th Cir. 2008).

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 31, 2009

cc:  Seth R. Aframe, Esquire
     Maureen Raiche Manning, Esquire